AO 9 (REV 5/85) Criminal Complaint

AUSA Michael J. Donovan (312) 886 - 2035

FILED
AUG - 8 2008
8-8-08
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CRISTOBAL VARGAS

**08 CR 630**

CRIMINAL COMPLAINT

CASE NUMBER:

**MAGISTRATE JUDGE COLE**

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about August 7, 2008, in Cook County, in the Northern District of Illinois, Eastern Division, defendant did,

> attempt to knowingly possess with intent to distribute a controlled substance, namely in excess of 500 grams of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title 21, United States Code, Section 846.

I further state that I am a Task Force Officer with the U.S. Drug Enforcement Administration, and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof: _X_ Yes __ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

August 8, 2008     at     Chicago, Illinois
Date                                   City and State

Jeffrey Cole, U.S. Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

STATE OF ILLINOIS     )
                      )
COUNTY OF COOK        )

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, TOM PISZCZOR, being duly sworn, state as follows:

### I. INTRODUCTION

1. I am employed by the Park Forest Police Department as a police officer and have been so employed for approximately 3 years. I am assigned as a Task Force Officer with the Drug Enforcement Administration ("DEA"), and have been detailed to DEA for approximately 8 months. I have received specialized training in the enforcement of state and federal narcotics laws, and I have been involved in all aspects of narcotics trafficking investigations, including: the role of acting as an undercover buy officer; the debriefing of defendants, witnesses, and informants; conducting surveillance; and analyzing documentary and physical evidence.

2. My official duties with DEA include investigating criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, and 846, and federal firearms violations including but not limited to, Title 18, United States Code Sections 922(g) and 924(c). I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. Some of the specialized training I have received includes, but is not limited to, classroom instruction concerning narcotics smuggling, money laundering investigations, and conspiracy and complex investigations. I have been involved in various types of electronic surveillance and the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the

1

distribution and transportation of controlled substances, the laundering and concealing of proceeds from drug trafficking and the organizations, the structure and methods of narcotics trafficking organizations, and street gangs who participate in these illegal activities. As a result of these investigative activities, I have conducted and participated in numerous investigations that have resulted in the seizure of hundreds of pounds of marijuana, as well as multiple kilograms of cocaine and heroin.

3. I submit this affidavit in support of a criminal complaint charging CRISTOBAL VARGAS ("VARGAS") with attempt to possess with intent to distribute a controlled substance, namely cocaine, in violation of Title 21, United States Code, Section 846.

4. The facts set forth in this affidavit are known to me as a result of my personal participation in this investigation and from reports made to me by other law enforcement agents, from records, documents, and other evidence obtained as a result of this investigation, and from individuals associated with and who have knowledge about the affairs of the subject individuals in this investigation and their confederates.

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a complaint, I have not included each and every fact known to me and other law enforcement agents concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause in support of the complaint.

6. Prior to this investigation, an individual, who is now a cooperating source ("CS"), came to the attention of DEA agents. CS begain cooperating with DEA in 1998 in exchange for monetary compensation. DEA expects to pay the CS approximately $5,000 in exchange for the CS's work in this investigation. CS has one conviction for possession of marijuana in 1998.

2

Since 1998, CS has provided cooperation in numerous investigations in which DEA and other agencies have seized in excess of 25 kilograms of cocaine, several hundred pounds of marijuana, in excess of $250,000 in United States currency, and arrested several individuals.

7. On August 1, 2008, agents met with the CS, searched CS and his vehicle for contraband and large amounts of United States currency with negative results. Agents directed CS to proceed to a muffler shop located on South Stony Island, in Chicago, and to meet the manager, CRISTOBAL VARGAS. This meeting was not recorded. Agents established surveillance of the muffler shop on South Stony Island in Chicago.

8. On August 1, 2008 at approximately 11:15 a.m. surveillance observed CS arrive at the muffler shop on South Stony Island. The CS's vehicle had Mexico license plates.

9. According to the CS, when CS drove into the muffler shop lot VARGAS immediately walked up to the CS. Surveillance observed VARGAS approach the CS while the CS was standing outside the shop and talking on CS's cellular telephone with a surveillance agent. According to the CS, VARGAS introduced himself and said he was also Mexican. The CS was using the direct connect feature of his/her phone to speak with a Spanish-speaking agent. At the time that VARGAS began speaking with the CS, the agent stated over the phone, "The kids are coming from Laredo." The direct connect feature on CS's phone works like a speaker phone, broadcasting incoming transmissions to anyone within earshot. According to the CS, immediately after the agent's transmission, VARGAS asked "Oh, the kids are coming from Laredo huh? Is it green?" The CS responded, "No, only white." Based on my experience, the experience of other agents, and a debriefing of the CS after this meeting, VARGAS's reference to green meant Cannabis and CS's reference to white, was a code for cocaine.

10. According to the CS, VARGAS said he had connections to sell cannabis, and the CS told VARGAS that the CS did not deal with cannabis because it was to bulky. At approximately 11:22 a.m., surveillance observed the CS and VARGAS having a discussion as they both entered the front office of the muffler shop. The CS stated they walked into the front office of the muffler shop where the CS told Vargas that the kids will be in Monday or Tuesday. VARGAS replied, "Alright, give me your phone number. We will make a good deal." The CS stated VARGAS said he would call the CS later.

11. At approximately 11:42 a.m. the CS was observed by surveillance entering his vehicle. As the CS entered his vehicle VARGAS approached the driver's side window where they proceeded to have a short conversation. The CS drove out of the muffler shop lot.

12. On August 2, 2008, at 11:57 a.m., CS placed a recorded call to the muffler shop at 773-933-6022. Agents provided CS with the number of the muffler shop and observed CS dial those numbers into CS's phone. A review of the recording reveals the following.[1] During that conversation, the CS asked, for the person in charge, VARGAS replied that he was in charge. The CS and VARGAS briefly discussed a vehicle. The CS said he/she was really busy with some guys tomorrow but when he/she gets free, either CS's cousin can take it to VARGAS, or

---

[1] At various points in the Affidavit, I will offer my interpretations of certain intercepted conversations/meetings in brackets and otherwise. My interpretations of these conversations are based on various agents' knowledge of the investigation to date and review of recordings, the contents and context of the conversations, prior and subsequent conversations, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations generally. Some of these summaries do not include references to all the topics covered during the course of the conversations. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. For these recordings, I have relied on draft – not final – transcripts of conversations.

4

CS would take it to VARGAS. VARGAS asked, what number those guys have. The CS responded, "The carpets are really good...good color and everything...very pretty white...very bright. I'm going to give it to you cheap....is twenty [$20,000] good for you?" VARGAS responded, "Let me see what I can do." The CS said, "Just tell me if you think it's good or bad." VARGAS said, "That's the cheapest?" VARGAS said that he would check and call the CS back.

13. On August 6, 2008, at approximately 12:10 p.m., CS placed a recorded call to VARGAS at 773-933-6022.[2] Agents provided CS with the number of the muffler shop and observed CS dial those numbers into CS's phone. A review of the recording reveals the following. During this conversation, VARGAS asked, "How many whatever [kilograms] do you have left?" The CS stated, "I only have 10 tickets [kilograms of cocaine] left. If you can do something good I'll give you a good price because I have to leave to go south. I have to check accounts with the bosses so then let me know if you want the tickets [kilograms of cocaine] and I can give them to you cheaper." VARGAS asked, "Well, what's the lowest?" The CS responded, "Well, tell me how much you'll do?" VARGAS responded, "Well, this asshole came by yesterday and he wanted some and that's why I called you. I can get the ten [kilograms of cocaine] from you tonight, but how can we do it? Where can I wait for you? Or how will we do it?" The CS stated that because it is the first time CS and VARGAS engaged in a narcotics deal, VARGAS must show the CS the money. CS further stated that if VARGAS paid the first time, the CS could provide the cocaine to VARGAS the second time on credit. VARGAS said, "I will

---

[2] An agent who was present at the time VARGAS was arrested and processed has listened to each of the calls described in this affidavit. The agent compared the voice attributed to VARGAS with VARGAS's voice at the time VARGAS was arrested. According to the agent, the voice attributed to VARGAS on the recorded calls described in this affidavit is VARGAS's voice.

call the guy to see if he's ready and call you back."

14. On August 6, 2008, at approximately 3:12 p.m., the CS received a call from VARGAS over 773-790-1783. Agents were present and observed the number of the incoming call on CS's telephone. A review of the recording of this call reveals the following. During this call, the CS stated, "I have some girls [kilograms of cocaine] that want to leave." VARGAS stated, "I have a guy that needs two [2 kilograms]. He has enough for two [2 kilograms] but he wants to see some pictures [samples]." The CS replied, "Look, I'm gonna tell you something. I have...the squares [kilograms] are closed. I can't open them up because they are going to say that I took some out to put some piece there. Tell them that I have some closed if they want...if they don't. No problem. When you have everything there...when it's all paid open it up in front of me, if you don't like it return it back to me and we're done. I can't open it up to give you the photo because then they won't want it like that. They are closed. That's the problem." Vargas responded, "That's okay. I'll call this asshole." The CS stated, "Tell him there's no problem if they don't like it how it is, in front of me when they are there. We open it up and they don't like it. They don't get it, but I can't open it up to give you a picture [sample]." VARGAS asked how much they [kilograms] are going to be. The CS said if you want 5 [kilograms] or more, I can give it for 19 [$19,000] so that you can make a profit, but if you get 5 [kilograms] or less, I will give them for 20 [$20,000] because I can't be moving the carpet [kilograms] around if they aren't going to get 10 [kilograms]. VARGAS said the guy has the cash for 2 [kilograms] . . . if you can do 19 500 [$19,500]. CS advised VARGAS to bring the cash and they would talk. The CS told VARGAS that the first time they will do it like this, and next time the CS can give VARGAS credit. VARGAS told the CS that he would call his guy to get everything ready.

6

15. On August 6, 2008 at 7:30 p.m., the CS placed a recorded call to VARGAS at 773-790-1783. Shortly after this call, the CS called agents to advise agents that CS had spoken to VARGAS. A review of the recording reveals the following. During this conversation, VARGAS said that he could do it tomorrow at 10. The CS told VARGAS to call the CS when VARGAS is ready and to give the CS the time to prepare the girls [kilograms]. VARGAS said he had 2 assholes...that one wants [unintelligible] and the other one needs 2 [kilograms]. The CS said the CS has 5 tickets [kilograms] right now and if VARGAS had the paper [cash] for 3 then CS would give VARGAS 5 [kilograms] as long as VARGAS is good for the 5 [kilograms]. VARGAS said he would call the CS tomorrow to square everything away. The CS told VARGAS to call him around 10.

16. On August 7, 2008, at approximately 10:23 a.m. CS placed a recorded call to VARGAS at 773-790-1783. Shortly after this call, the CS called agents to advise agents that CS had spoken to VARGAS. A review of the recording reveals the following. VARGAS said he was ready. The CS said that he/she is going to get up and take a shower and that he/she is in Aurora collecting some paper [cash]. The CS said he/she will leave Aurora around 1:00 p.m. and meet with VARGAS around 2:00 or 3:00 that afternoon. VARGAS said the guys are from Indianapolis and are here now but he'll tell them to wait for the CS.

17. On August 7, 2008, at approximately 2:50 p.m., CS placed a call to VARGAS at 773-790-1783. Agents observed the numbers dialed by CS into CS's phone. A review of the recording reveals the following. During this conversation, the CS said that he/she was ready with the tickets [kilograms] for the game [deal]. VARGAS said they are ready. CS said he/she is in the corner by the pharmacy and Wendy's on 87th Street in Chicago. The CS told VARGAS

to come meet the CS. The CS told VARGAS to come by himself with the papers [cash] and that the CS is only going to trust VARGAS if he is by himself. The CS told VARGAS to meet the CS in 10 to 15 minutes. VARGAS said he would call this guy so that he can bring the papers to the CS.

18. On August 7, 2007, at approximately 3:39 p.m., CS received an incoming from 773-790-1783. Agents were present and observed the number of the incoming call on CS's telephone. A review of the recording revealed the following. VARGAS said that he is arriving at Wendy's. The CS said that he/she had to leave because there were a lot of people around but he/she will go back. VARGAS said he had all the stamps [cash]. The CS said he/she was in the hotel but will meet VARGAS in 10 minutes.

19. At approximately 3:55 p.m., surveillance observed VARGAS leave the muffler shop on South Stony Island seated in the front passenger side of a green Ford minivan which was driven by Individual A. Surveillance was established at the Walgreen's at 1616 East 87th Street in Chicago. At approximately 4:00 p.m. surveillance observed the green minivan park in the the parking lot of the Walgreen's located at 1616 East 87th Street in Chicago, with Individual A driving and VARGAS in the passenger seat.

20. Agents met with CS prior to CS's meeting with VARGAS and searched CS and his vehicle for contraband and large amounts of United States currency with negative results. At approximately 4:05 p.m., surveillance observed CS drive into the parking lot of the Walgreens at 1616 East 87th Street. At approximately 4:12 p.m. surveillance observed VARGAS exit the passenger side vehicle of a green Ford minivan. According to surveillance, a review of the video recordings of the event, and the CS, VARGAS got out of the minivan, retrieved a box from the

minivan, and began to carry that box across the parking lot in the direction of the CS's vehicle. VARGAS walked to the CS's vehicle with the cardboard box, and entered the passenger side of the CS's vehicle. According to the CS, while VARGAS was inside the CS's vehicle, VARGAS opened the box and showed the CS the United States currency inside the box.

21. At approximately 4:15 p.m., VARGAS was placed under arrest while seated in the front passenger seat of the CS's vehicle. Agents recovered the same box which VARGAS had carried into the CS's vehicle. The box was recovered from the front passenger side floor of the CS's vehicle, which is the location where VARGAS was seated. The box contained approximately $46,000 in United States currency.

FURTHER AFFIANT SAYETH NOT.

Tom Piszczor
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed before me on this 8th day of August, 2008.

JEFFREY COLE
UNITED STATES MAGISTRATE JUDGE

9